# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**HEIDI ZOEPHEL**
             **Plaintiff,**

        **v.**                                        **Case No. 12-C-726**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social Security Administration**
             **Defendant.**

---

## DECISION AND ORDER

Plaintiff Heidi Zoephel seeks judicial review of the denial of her application for social security disability benefits. Plaintiff alleged inability to work due to mental impairments, but the Social Security Administration ("SSA") denied her application initially (Tr. at 80-81) and on reconsideration (Tr. at 82-83), as did an Administrative Law Judge ("ALJ") following a hearing (Tr. at 14-27). The Appeals Council declined review (Tr. at 1), making the ALJ's decision the Commissioner's final word on the application. Shauger v. Astrue, 675 F.3d 690, 694 (7th Cir. 2012).

My review of the ALJ's decision is limited to ensuring that he applied the correct legal standards and supported his decision with "substantial evidence." Jelinek v. Astrue, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is such relevant evidence as a reasonable person could accept as adequate to support a conclusion. Kastner v. Astrue, 697 F.3d 642, 646 (7th Cir. 2012). Under this deferential standard, the court may not re-weigh the evidence or substitute its judgment for that of the ALJ; if reasonable minds could differ over whether the claimant is disabled, the court must uphold the decision under review. Shideler v. Astrue, 688

F.3d 306, 310 (7th Cir. 2012). In rendering his decision, the ALJ must build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence. Id.

## I. FACTS AND BACKGROUND

### A.    Disability Applications and Supporting Materials

On April 8, 2009, plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"), alleging a disability onset date of September 30, 1998. (Tr. at 158, 165.)[1] In an accompanying disability report, she indicated that she was depressed and unable to function on a daily basis. She stated that she suffered from anxiety attacks when in public and had a hard time concentrating on simple tasks. (Tr. at 212.) She reported past employment for fast food restaurants, last working in 2005.[2] (Tr. at 204, 213.) In a function report, plaintiff wrote that on a typical day she awoke, had coffee, and did a load of wash, then laid down. After an hour, she got up and cleaned, then made lunch and read. She napped until 2:30, then thought about what to make for dinner. Her neighbor usually came over before she went to bed to remind her to take her medication. (Tr. at 246.)

The neighbor prepared a third party function report, indicating that plaintiff cleaned, did laundry, and watched TV. (Tr. at 219.) She had no problems with personal care but sometimes needed reminders to take her medication. She cooked simple meals daily and performed household chores, including cleaning, laundry, and ironing. (Tr. at 220-21.) Her

_____

[1]Plaintiff later amended the alleged onset date to a date subsequent to the expiration of her DIB insured status. Thus, only the SSI application remains for consideration. (Tr. at 17.)

[2]According to the wage information in the record, plaintiff earned nothing from 2006-2010; $351.30 in 2005; nothing in 2003 and 2004; $939.87 in 2002; and nothing from 1996 to 2001. (Tr. at 174, 175.)

2

hobbies included watching TV and reading; social activities included visiting with neighbors. (Tr. at 223.) The neighbor wrote that plaintiff's impairment affected her memory, concentration, and understanding. (Tr. at 224.) The neighbor further indicated that plaintiff handled stress badly and did not like change. (Tr. at 225.)

## B.    Medical Evidence

The medical records indicate that on April 12, 2008 plaintiff was taken to the emergency room following an apparent suicide attempt. (Tr. at 335.) After drinking all day, she got into an argument with her son, then took several of her son's Seroquel tablets. ER personnel provided charcoal and IV fluids, and admitted her to the ICU for further observation and treatment. (Tr. at 332-35.) On April 15, 2008, she was admitted for in-patient psychiatric evaluation (Tr. at 310, 312, 315, 318), reporting increasing depression for the past few months, with racing thoughts. She also complained of mood swings and impulsiveness, drinking to mellow herself out. (Tr. at 312.) On mental status exam, she appeared alert and oriented, with okay mood, appropriate affect, goal directed thought processes, fair insight and judgment, and minimal withdrawal symptoms. Doctors assessed alcohol withdrawal, alcohol dependence, and bipolar disorder – current episode depressed, with a GAF of 45-50.[3] (Tr. at 313.) Admitted under voluntary condition, doctors provided plaintiff medications including Lorazepam, Geodon, Celexa, and Trazodone. (Tr. at 314.) During an April 16, 2008, psychiatric follow-up, plaintiff

---

[3]GAF ("Global Assessment of Functioning") rates the severity of a person's symptoms and her overall level of functioning. Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting herself or others. Scores of 81-90 reflect "minimal" symptoms, 71-80 "transient" symptoms, 61-70 "mild" symptoms, 51-60 "moderate" symptoms, 41-50 "severe" symptoms, 31-40 some impairment in reality testing, 21-30 behavior considerably influenced by delusions or hallucinations, and 11-20 some danger of hurting self or others. Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th ed. 2000).

reported that she had been able to sleep the previous night, and that medication helped with racing thoughts. Thoughts of wanting to harm herself were much better. On mental status exam, she was alert, oriented, mood was fair, affect appropriate, thought process goal directed, and insight and judgment fair. Doctors again diagnosed her with alcohol withdrawal, alcohol dependence, and bipolar disorder, depressed, deciding to continue to monitor her; if she continued to do okay, they would discharge her the next day. (Tr. at 310.) Plaintiff was discharged on April 17, 2008, with a GAF of 50-55. Plaintiff requested the discharge, and because she was neither suicidal or homicidal, and no longer in withdrawal, the request was granted. On discharge, she was alert, oriented, mood good, affect pleasant, thought process goal directed, and insight and judgment fair. (Tr. at 315.) She was to follow up with a therapist on April 18, 2008, then with Dr. Cueto, a psychiatrist.[4] Doctors rated her prognosis as fair. (Tr. at 316.)

On December 20, 2008, friends brought plaintiff to the emergency room following another suicide attempt by overdose. Plaintiff admitted being a chronic alcoholic, and to drinking again. On physical exam, she was moderately to severely anxious and somewhat irritable in her mood and affect. Doctors provided oral charcoal, oral hydration, and monitored her condition. She was then admitted to the psychiatric unit in stable condition. (Tr. at 302-03.) Plaintiff reported feeling overwhelmed, helpless, and hopeless, and to relapsing the previous day. (Tr. at 299.) She further reported that she had not worked for the past year because of problems with her son. Her boyfriend's income and child support helped her get by, and she planned to return to work in January. On mental status exam, she was alert and oriented;

[4]The record contains Dr. Cueto's treatment notes, dated May 15, 2008 to April 27, 2010, but they are handwritten and mostly illegible. (Tr. at 472-85.)

mood was okay; affect was appropriate; thought process normal; insight and judgment fair; with no suicidal or homicidal ideation. Doctors assessed bipolar disorder, depressed, and alcohol abuse, with a GAF of 50-55. Plaintiff's request for discharge was granted on December 20, as she seemed to be feeling better. She was to follow up with Dr. Cueto, with a fair to guarded prognosis. (Tr. at 300-01).

From May 2 to 15, 2009, plaintiff received treatment for cardiac issues, which improved with treatment. (Tr. at 322-24, 328-30, 359-60, 367-68.) On May 23, 2009, she was seen at St. Luke's Hospital for back pain and given pain pills. (Tr. at 348-51.) On November 7, 2009, plaintiff was taken to St. Francis Hospital after drinking alcohol and taking thirty Trazodone (Tr. at 397), then transferred to the Milwaukee County Mental Health Complex on an emergency detention. (Tr. at 265-71, 401.)

In early April 2010, plaintiff relapsed with alcohol, and on April 21, 2010, she began receiving AODA treatment at Aro Behavioral Healthcare. During her initial assessment, the counselor assessed alcohol dependence, with GAF of 50. (Tr. at 538.) On mental status exam, plaintiff was oriented x3, with normal speech, flat affect, and calm, depressed mood. The counselor noted no memory or attention/concentration problems, but plaintiff's impulse control was severely impaired, her judgment moderately impaired, and her insight moderately impaired. (Tr. at 533.)

In July 2010, plaintiff began seeing a new psychiatrist, Dr. Paul Harris. (Tr. at 486.) During the initial July 2, 2010 psychiatric evaluation, plaintiff reported a history of bipolar disorder. During depressive episodes, she reported decreased activities, isolation, and hopelessness. During manic episodes, she reported increased irritability and energy, decreased need to sleep, and racing thoughts. She also complained of panic attacks

5

characterized by palpitations, dizziness, and nausea. She was at the time taking Effexor, Trazadone, Geodon, and Remeron. (Tr. at 497.) She reported long-term alcohol abuse, sober since April 2010. (Tr. at 498.) On mental status exam, she appeared sad and anxious, however, her thought process was logical, with no evidence of delusions or hallucinations. Memory was intact, fund of knowledge good, and insight and judgment good. Dr. Harris diagnosed bipolar disorder and panic disorder, with a GAF of 50. (Tr. at 500.) He continued current medications and added Buspirin. (Tr. at 501.)

During an August 12, 2010, session with Dr. Harris, plaintiff reported not drinking and attending AA. She reported variable mood, fragmented sleep, and panic episodes twice per day. Dr. Harris increased her Remeron dose. (Tr. at 496.) On September 21, 2010, plaintiff again reported no alcohol use since April 3, 2010. She again reported variable mood and appeared depressed. Dr. Harris added Lithium. (Tr. at 495.) On November 5, 2010, plaintiff again reported no alcohol use since April 2010. Her mood was still variable. Dr. Harris continued the current treatment plan. (Tr. at 494.) A December 29, 2010 note lists diagnoses of alcohol dependence in early remission, bipolar disorder, and panic disorder; and psychiatric medications of Effexor, Remeron, Trazodone, Geodeon, Buspar, and Lithium. Plaintiff was seeing a therapist for AODA issues and also attended AA with a sponsor. She also attended a wellness group weekly and an abusive relationship group weekly. (Tr. at 489.) Dr. Harris stated plaintiff was sober, with stable mood, although she did experience stress in attempting to regain custody of her children. He increased her Trazodone dosage. (Tr. at 493.)

In December 2010, plaintiff was admitted to the "Invisible Children's Program," an intensive case management program, through Mental Health America of Wisconsin. According to a February 15, 2011 letter from the program manager, plaintiff was prompt and attentive in

groups and classes, and participated freely, demonstrating retention and understanding of the topics. (Tr. at 503.) In the initial "parent needs assessment," plaintiff described a typical day as attending various groups, working on crafts, going to the library, and going to bed early. She wanted help getting her children home, managing stress, and living without medications. (Tr. at 507.) Program notes confirmed plaintiff's active participation, sobriety since April 2010, and desire to get her mental health issues under control and regain custody of her children (lost in the spring of 2009). (Tr. at 510-26.) According to a February 25, 2011, letter from plaintiff's substance abuse counselor to the child welfare caseworker, plaintiff had made a genuine commitment to recovery (Tr. at 528), regularly attending counseling at Aro from April 2010 to February 2011 (Tr. at 529-58).

## C. State Agency Consultants

The SSA also arranged for plaintiff's condition to be evaluated by several consultants. On September 10, 2009, William Snyder III, Ph.D., completed a psychiatric review technique form ("PRTF"). (Tr. at 381.) Dr. Snyder noted scant treatment records, as her primary psychiatric source (Dr. Cueto) did not forward information. (Tr. at 384.) He accordingly found insufficient evidence to rate the degree of limitation under the "B criteria" of the mental health Listings.[5] (Tr. at 391.)

---

[5]The B criteria, which are used to rate the claimant's impairment-related functional limitations, have four components: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, and pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). The ALJ rates degree of limitation using a five-point scale: none, mild, moderate, marked, and extreme. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity. 20 C.F.R. § 404.1520a(c)(4). A claimant also meets the Listing if she establishes at least two of the following: "marked" restriction in daily activities; "marked" difficulties in maintaining social functioning; "marked" difficulties in maintaining concentration, persistence, or pace; and "repeated" episodes of decompensation, each of extended duration. See, e.g., Larson v. Astrue, 615 F.3d 744, 748

7

On November 17, 2009, plaintiff underwent a consultative psychological evaluation with Mark Pushkash, Ph.D. Dr. Pushkash noted that plaintiff had been seeing Dr. Cueto for two years for psychiatric care, and had been hospitalized three times in the last couple of years (Tr. at 404), including three days at the Milwaukee County Mental Health Center on an emergency detention the previous week (Tr. at 405). She reported activities of going to her meetings and watching TV. She did most of the cooking, cleaning, and shopping; her boyfriend handled the laundry and finances. She reported being able to engage in basic activities of daily living in a self-initiated, self-directed, autonomous fashion. She further reported being socially withdrawn, but got along reasonably well with others when not drinking. On mental status exam, her thoughts appeared organized, logical, and goal-directed, with no evidence of irrational thinking, paranoia, or hallucinations. Emotionally, her affect was flat and her mood seemed depressed. However, she denied various symptoms of a manic phase, and Dr. Pushkash believed her symptoms indicative of a major depressive disorder, not necessarily bipolar disorder; issues with mood variability and aggressiveness seen in the past had been in the context of her drinking. Cognitive measures were unremarkable. (Tr. at 406.) Dr. Pushkash diagnosed major depression, recurrent, severe; and alcohol dependence; with a GAF of 45. He concluded that plaintiff had the intellectual ability to comprehend, recall, and follow through on instructions. Her ability to concentrate and persist on task was moderately impaired due to the interfering effect of depression. He found it likely she would have some difficulties relating appropriately to supervisors and co-workers in a work setting, as she was described as easily frustrated and at times irritable. Historically, she had trouble dealing with stress, which caused her to drink.

_____

(7th Cir. 2010).

Finally, he recommended a payee should she be awarded benefits; given the significant potential for alcohol relapse, it was likely she would use the funds inappropriately if allowed to manage them on her own.  (Tr. at 407.)

On December 1, 2009, Ellen Rozenfeld, Psy.D., completed a PRTF, evaluating plaintiff under Listings 12.04 (Affective Disodrers) and 12.09 (Substance Addiction Disorders).  (Tr. at 425.)  Under the B criteria, she found mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and one or two episodes of decompensation.  (Tr. at 433.)  In a mental residual functional capacity ("RFC") assessment, Dr. Rozenfeld found moderate limitations in the ability to carry out detailed instructions, maintain attention and concentration for extended periods, interact appropriately with the general public, get along with co-workers, and respond appropriately to changes in the work setting; she found no significant limitations in the other listed areas.  (Tr. at 437-38.)

On May 10, 2010, Jeffrey Adamczak, Psy.D., completed another psychological evaluation.  (Tr. at 460.)  Plaintiff indicated that she was in recovery for alcohol abuse and denied any current usage, but Dr. Adamczak noted a distinct and strong smell of alcohol during the meeting.  On mental status exam, plaintiff presented as cordial and cooperative, and she spoke in complete sentences.  (Tr. at 461.)  Affect appeared depressed at times, flat at other times.  She noted frequent mood swings, and Dr. Adamczak noted evidence of anxiety (e.g., rocking back and forth, hand tremors).  She denied hallucinations or psychotic thought processes.  She had attempted suicide, resulting in hospitalizations over the past two years, and she admitted some fleeting suicidal thoughts currently.  She presented as logical and coherent, oriented x3.  Her recall for personal history appeared marked by mild to moderate

9

memory problems.  (Tr. at 462.)  Socialization was limited to a neighbor and boyfriend.  (Tr. at 463.)  Dr. Adamczak diagnosed bipolar disorder, alcohol dependence, and generalized anxiety disorder, with a GAF of 45.  (Tr. at 463-64.)  He concluded that she was expected to have mild difficulties understanding directions; moderate difficulties remembering and carrying out simple instructions; and mild difficulties in responding appropriately to supervisors and co-workers due to depression and mood swings.  Her ability to maintain attention and concentration appeared to be moderately impaired, and she was expected to have moderate difficulties withstanding routine work stress and adapting to change.  (Tr. at 464.)

Finally, on May 17, 2010, Kyla King, Psy.D., affirmed the PRTF and mental RFC of December 1, 2009, as written.  (Tr. at 465.)

## D.      ALJ Hearing

On March 22, 2011, plaintiff appeared with counsel before ALJ Timothy Malloy.  (Tr. at 34.)  At the hearing, plaintiff's counsel amended the alleged disability onset date to March 25, 2009 (the date of her application), a date after her insured status expired, thus mooting her DIB application.  (Tr. at 43-44.)

On questioning by the ALJ, plaintiff admitted a long history of alcohol abuse, dating back to when she was thirteen (she was forty-seven at the time of the hearing), but indicated that she had been sober for fourteen months.[6]  (Tr. at 44, 50-51.)  Prior to quitting, she consumed two bottles of vodka per week.  (Tr. at 51.)  She testified that she got tired of being sick every day, feeling more depressed once the alcohol wore off, then drinking more.  (Tr. at 51.)

Plaintiff testified that she had three children, with the youngest two in foster care due to

_____

[6]She denied drinking prior to the evaluation with Dr. Adamczak in May 2010, ten months prior to the hearing.  (Tr. at 68.)

her drinking and mental health issues. (Tr. at 45-46.) She resided with her boyfriend of seven years in an apartment she had rented for fourteen years. (Tr. at 47.) They lived on his social security disability benefits. (Tr. at 48.) She testified that she did some housework, but he did most of the cooking. (Tr. at 48.)

Plaintiff testified that she went to group meetings – AA and a mental wellness class – attending each twice per week. (Tr. at 49.) She had a GED. (Tr. at 50.) Aside from an OWI many years ago, she denied any trouble with the law. (Tr. at 50.) Plaintiff admitted that she had improved since she quit drinking but stated that she still experienced anxiety attacks and depression; her doctor indicated he could not provide stronger medications – "they're already maxed out." (Tr. at 52.) Plaintiff testified that she took Effexor and Trazodone for her mental illness, and Campral to reduce her craving for alcohol. (Tr. at 53.) She also relied on her counselors and AA sponsor to help her, contacting them when she felt overwhelmed. (Tr. at 62.) She denied that she would go back to drinking if granted benefits, noting her involvement in AA. (Tr. at 69.)

Plaintiff testified to work experience in food service, but she had not been employed in some time, last working full-time in 1998. (Tr. at 54.) One of her children received SSI for a cognitive disability. Plaintiff testified to no physical problems. (Tr. at 55.) Asked why she could not work, plaintiff replied that she could not handle the pressure and the panic attacks; her memory was "not there, sometimes I just go off in my own little world." (Tr. at 55.) Asked what she liked to do, plaintiff responded that she read a lot, although she sometimes had trouble comprehending and had to read it a couple of times. (Tr. at 55-56.) She also enjoyed working on crafts and making planters, which she sold in the summer. (Tr. at 56.) Otherwise, she watched TV. (Tr. at 56.) She denied recreational interests and rarely went out; neither she or

11

her boyfriend drove. (Tr. at 47, 57.) She usually took the bus for transportation, but if the bus got too crowded she experienced anxiety and had to get off. (Tr. at 57.) She denied social relationships outside her family. (Tr. at 59.)

The ALJ attempted to equate plaintiff's efforts to get better to regain custody of her children with her ability to work, but plaintiff responded that her children were older and pretty much took care of themselves; she also indicated that her boyfriend was there to help her with the children; alone, she did not believe she would be able to take care of them. (Tr. at 58.) On later questioning from her lawyer, plaintiff denied the ability to perform even a simple job because her "mind races" and she "can't concentrate on what [she's] doing." (Tr. at 66.) She also denied the ability to deal with work stress in a job that required a fast pace. (Tr. at 67.)

The ALJ summoned a vocational expert ("VE"), Allen Searles, who classified plaintiff's past employment in fast food as unskilled, light exertion level work. (Tr. at 73.) Assuming that this employment did not qualify as past relevant work, the ALJ asked the VE a hypothetical question assuming a person of plaintiff's age, education, and work experience, without any exertional limitations, limited to unskilled work involving simple, routine, and repetitive tasks; in a low stress job setting, defined as requiring only occasional work-related decisions, and only occasional changes in the work environment, with no fast-paced production requirements; no interaction with the public and only occasional interaction with co-workers; and no more than moderate exposure to excessive noise. (Tr. at 73-74.) The VE testified that such a person could work as a janitor/cleaner, street cleaner, and bagger in the garment industry. (Tr. at 74.)[7]

---

[7]The ALJ also asked about a person unable, due to mental impairments, to sustain sufficient concentration, persistence, and pace to work in a competitive work environment on sustained basis. Of course, the VE responded that such a limitation would eliminate all jobs. (Tr. at 74.)

## E.    ALJ's Decision

On May 27, 2011, the ALJ issued an unfavorable decision. (Tr. at 14.) Applying the familiar five-step sequential evaluation process, see 20 C.F.R. § 416.920(a)(4), he determined at step one that plaintiff had not worked since March 25, 2009, the amended onset date, and at step two that she suffered from the severe impairments of bipolar disorder and alcohol abuse/dependence. (Tr. at 19.) At step three, the ALJ considered Listings 12.04 and 12.09, finding neither met. (Tr. at 19.) Under the B criteria of the Listings, the ALJ found mild restriction of activities of daily living; moderate difficulty in social functioning; moderate difficulty in concentration, persistence, and pace; and one to two episodes of decompensation. (Tr. at 20.)

The ALJ then determined that plaintiff retained the RFC to perform a full range of work at all exertional levels but with the following non-exertional limitations: unskilled work involving simple, routine, and repetitive tasks; low stress work (only occasional work-related decisions, only occasional changes in job setting, and no fast-paced production requirements); avoid moderate exposure to loud noise; and no interaction with the public and only occasional interaction with co-workers. (Tr. at 20-21.) In making this determination, the ALJ considered plaintiff's statements, finding her allegations that she was disabled "less than credible." (Tr. at 24.) The ALJ acknowledged plaintiff's long history of bipolar disorder, but noted her long and concomitant history of alcohol abuse and dependence. Plaintiff claimed sobriety since April 2010, yet Dr. Adamczak smelled alcohol during the May 2010 mental status evaluation. The ALJ noted that the record showed that plaintiff got along with others when sober, but became belligerent and verbally aggressive when intoxicated. Even with the overlay of alcoholism, the ALJ noted, plaintiff was able to perform activities of daily living and was progressing on her goal

13

of regaining custody of her children.  Mental health records likewise reflected good progress with regard to parenting and relationship issues.  (Tr. at 24.)

The ALJ also considered the medical opinions.  He noted that Dr. Pushkash performed a consultative exam in November 2009, diagnosing plaintiff with major depression, recurrent, severe; alcohol dependence; and a GAF of 45, indicative of severe symptoms and impairment in functioning.  (Tr. at 22-23.)  Dr. Pushkash opined that plaintiff had the intellectual capability to comprehend, recall, and follow instructions.  Her ability to concentrate and persist in task was moderately impaired due to the interfering effect of depression.  The doctor further opined that plaintiff might have some difficulty relating to supervisors and co-workers, as she was easily frustrated and at times irritable.  He noted that historically work stress caused plaintiff to start drinking again.  (Tr. at 23.)

Dr. Adamczak saw plaintiff for a further consultative exam in May 2010, reporting disturbed sleep, nervous eating with weight gain, suicidal thoughts, crying spells, mood swings, and anxiety.  She denied alcohol use, but Dr. Adamczak noted a strong smell of alcohol.  (Tr. at 23.)  Dr. Adamczak diagnosed bipolar disorder, moderate; alcohol dependence; and generalized anxiety disorder; with a GAF of 45.  He opined that she had mild difficulties in understanding directions and would likely have moderate difficulty remembering and carrying out simple instructions.  He further opined that she would have mild difficulty in responding appropriately to supervisors and co-workers; her ability to maintain concentration and attention was moderately impaired; and she had moderate difficulty withstanding routine work stress and adapting to change.  (Tr. at 24.)

The ALJ acknowledged that both examiners assessed a GAF of 45, but "they also indicated that this was, at least in part, related to her alcohol dependence."  (Tr. at 25.)  The

14

examiners also assessed only mild to moderate difficulty in specific areas of functioning. The ALJ gave "significant weight" to the consultants' opinions in setting RFC, as they were well supported by the record. (Tr. at 25.) The ALJ also have significant weight to the opinions of the state agency consultants, Drs. Rozenfeld and King, who concluded at the initial and reconsideration levels that plaintiff retained the RFC for routine and simple work on a sustained basis. (Tr. at 25.)

At step four, the ALJ determined that plaintiff had no past relevant work. (Tr. at 25.) At step five, the ALJ determined that plaintiff could perform other work. (Tr. at 25-26.) Relying on the VE's testimony, the ALJ concluded that plaintiff could work as a street cleaner, janitor, and bagger. The ALJ thus found plaintiff not disabled and denied her application. (Tr. at 26.)[8]

## II. DISCUSSION

In this court, plaintiff argues that the ALJ erred in (1) finding her capable of work despite the GAF scores of 45 assigned by the consultative examiners, (2) ignoring Dr. Harris's GAF score of 50, and (3) failing to account for her moderate limitation in concentration, persistence, and pace. I address each argument in turn.

## A. Consultants' GAF Scores

Plaintiff argues that it was inconsistent for the ALJ to give "significant weight" to the consultants' reports, which included GAF scores of 45, yet find her capable of full-time

---

[8]After the hearing (and just before the ALJ's decision issued), plaintiff was diagnosed with invasive squamous cell carcinoma of the oral cavity. She provided records related to this condition to the Appeals Council (Tr. at 560-72), but the Council indicated that it did not affect whether plaintiff was disabled on or before May 27, 2011 (the date of the ALJ's decision). The Council indicated that if plaintiff wanted the SSA to consider whether she became disabled after that, she needed to apply again. (Tr. at 2.) Plaintiff does not allege Council error in her request for judicial review.

15

competitive employment.  See Campbell v. Astrue, 627 F.3d 299, 307 (7th Cir. 2010) ("A GAF rating of 50 does not represent functioning within normal limits.  Nor does it support a conclusion that Campbell was mentally capable of sustaining work.").  However, "nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score."  Denton v. Astrue, 596 F.3d 419, 425 (7th Cir. 2010) (internal quote marks omitted).  While GAF scores may be useful for planning treatment, they are measures of both severity of symptoms and functional level.  "Because the 'final GAF rating always reflects the worse of the two,' the score does not reflect the clinician's opinion of functional capacity."  Id. (quoting DSM-IV at 33).  Accordingly, in Denton, the Seventh Circuit approved the ALJ's reliance on the doctor's narrative findings regarding the claimant's mental limitations, rather than "the unexplained numerical score."  Id.

In the present case, the ALJ credited the consultants' specific opinions regarding plaintiff's ability to understand, remember, and carry out simple instructions; respond appropriately to supervisors and co-workers; and deal with changes in a routine work setting (Tr. at 25), which correspond to the basic mental demands of competitive, remunerative, unskilled work, see SSR 85-15.  Plaintiff points to no medical opinion imposing greater work-related restrictions, nor does she contend that the ALJ erred in adopting the consultants' narrative findings.  And under Denton, the ALJ was not required to disregard these narrative findings and find disability based solely on the GAF scores.  See, e.g., Lee v. Astrue, No. 1:12-CV-00038, 2012 WL 6681715, at *10-11 (N.D. Ind. Dec. 21, 2012) (finding no error in the ALJ's failure to specifically discuss GAF scores of 50 where the ALJ adequately considered the medical evidence, including many of the reports that contained these GAFs, and collecting cases); Hearn v. Astrue, No. 1:11-CV-00394, 2012 WL 4361452, at *6 (N.D. Ind. Sept. 24,

16

2012) (rejecting argument that the ALJ erred by failing to mention GAF score of 50 where the medical report upon which the ALJ relied expressly considered this GAF score when concluding that the claimant retained the ability to perform simple, repetitive tasks); Smith v. Astrue, No. 4:11-cv-68, 2012 WL 4119018, at *7 (S.D. Ind. Sept. 19, 2012) (affirming where doctor assigned GAF score of 50 yet nevertheless opined that the claimant appeared capable of understanding, remembering, and carrying out simple to moderately complex instructions and could relate to and communicate effectively with others); Bayless v. Astrue, No. 11 C 3093, 2012 WL 3234044, at *17 (N.D. Ill. Aug. 6, 2012) ("Given the ALJ's extensive discussion of the narrative findings provided by Dr. Lelio, Dr. Hilger and Dr. Henson, her failure to specifically mention Plaintiff's GAF scores does not serve as a basis for a remand in this case."); D.R.S. ex rel. Walker v. Astrue, No. 1:11-cv-0403, 2012 WL 3061596, at *8 (S.D. Ind. July 26, 2012) (affirming despite the ALJ's failure to discuss GAF scores of 50 and below, where the ALJ adequately considered the medical and other evidence of the claimant's functioning); Warner v. Astrue, 880 F. Supp. 2d 935, 2012 WL 3044244, at *6 (N.D. Ind. July 25, 2012) (finding no error where the ALJ failed to accept GAF score of 50/45 as evidence that the claimant was mentally incapable of performing even unskilled work); Perez v. Astrue, No. 11 CV 03153, 2012 WL 2590537, at *29 (N.D. Ill. July 3, 2012) (finding debatable the significance of a single RFC score of 45-50 and stating that "a claimant cannot use a GAF score to establish disability"); Thomas v. Astrue, No. 2:11-cv-188, 2012 WL 2130582, at *7 (N.D. Ind. June 12, 2012) ("Plaintiff also argues that his GAF score of 48 proves that he has disabling depression. However, a GAF score alone is not determinative of disability. Because the ALJ described how she reached her conclusion regarding Plaintiff's depression, including her consideration of medical expert opinions, the ALJ's decision on this point will not be reversed or remanded.")

17

(internal citations omitted); Morgan v. Astrue, No. 11 C 463, 2012 WL 1985666, at *6 (N.D. Ill. June 4, 2012) (finding no error where the ALJ disregarded GAF scores of 45 and 50 given by two examining psychiatrists, as the only reports in the record of the claimant's mental impairment as it related to her ability to perform work found no limitations and the claimant offered no contrary psychiatric assessment of her ability to perform work-related activities); Anderson v. Astrue, No. 3:11-CV-153, 2012 WL 1200934, at *6 (N.D. Ind. Apr. 10, 2012) (finding no error in ALJ's failure to consider GAF score of 50, where the ALJ did consider the psychologist's opinion that the claimant had moderate impairment in her ability to initiate, sustain, and complete tasks independently and to withstand usual work pressures); Dencausse v. Astrue, No. 11-207, 2012 WL 525967, at *8-9 (S.D. Ill. Jan. 26, 2012) (finding no error where the ALJ relied on doctor's narrative findings rather than GAF scores), adopted, 2012 WL 525587 (S.D. Ill. Feb 16, 2012).

Moreover, this was not a case where the ALJ cited high GAF scores while ignoring lower ones, see, e.g., Walters v. Astrue, 444 Fed. Appx. 913, 919 (7th Cir. 2011); Pickett v. Astrue, No. 1:11-cv-0160, 2012 WL 4470242, at *6 n.3 (S.D. Ind. Sept. 27, 2012); Eisaman v. Astrue, No. 1:11-CV-00229, 2012 WL 3028040, at *8 (N.D. Ind. July 24, 2012), or otherwise disregarded significant evidence contrary to his decision, see, e.g., Beth v. Astrue, 494 F. Supp. 2d 979, 1006-07 (E.D. Wis. 2007); Patterson v. Barnhart, 428 F. Supp. 2d 869, 884 (E.D. Wis. 2006).[9]  Indeed, the ALJ mentioned the consultants' GAF scores several times in

_____

[9]In arguing that the ALJ erred in this regard, plaintiff relies solely on Campbell, but in that case the ALJ selectively discussed portions of a physician's report supporting a finding of non-disability while ignoring other portions (including, inter alia, a GAF score) that suggested disability.  627 F.3d at 306-07.  In the present case, the ALJ did not ignore any significant portion of the consultants' reports, including the GAF scores.  Nothing in Campbell requires an ALJ to find disability based on a GAF score of 50 or lower.

his decision. In initially discussing Dr. Pushkash's opinion, the ALJ noted the GAF score of 45, "which is reflective of serious symptoms and impairment in functioning." (Tr. at 23.) He then discussed Dr. Pushkash's specific findings on plaintiff's ability to follow instructions, concentrate and persist on task, and relate to others. (Tr. at 23.) The ALJ noted that Dr. Adamczak "also assessed her GAF as 45," with mild to moderate difficulties in following directions, responding appropriately to others, maintaining attention and concentration, and withstanding work stress. (Tr. at 24.) As discussed above, it was not unreasonable for the ALJ to rely on the consultants' narrative findings in setting RFC, rather than the GAF scores.

Later in his decision, the ALJ again noted that the consultants "assessed the claimant's GAF as 45, [but] they also indicated this was, at least in part, related to her alcohol dependence." (Tr. at 25.) Plaintiff argues that this assertion lacked record support. While the consultants did not explicitly make this connection, the ALJ could infer that the scores related in part to alcohol abuse. See Stevenson v. Chater, 105 F.3d 1151, 1155 (7th Cir. 1997) ("The ALJ was entitled to make reasonable inferences from the evidence before him[.]"). As the ALJ noted, both doctors diagnosed alcohol dependence on Axis I, setting the GAF at 45 on Axis V. (Tr. at 23, 407 – Dr. Pushkash; Tr. at 24, 463-64 – Dr. Adamczak.) It was not unreasonable for the ALJ to assume that this diagnosis played some role in the GAF, particularly given the discussion of alcohol abuse in the body of the reports. For instance, Dr. Pushkash declined to diagnose bipolar disorder, noting the absence of symptoms of a manic phase. Instead, Dr. Pushkash attributed plaintiff's problem with mood variability to drinking (Tr. at 406), and the ALJ specifically found that the "record indicates that [plaintiff] gets along reasonably well with others as long as she is not drinking. However, she can become belligerent and verbally aggressive when intoxicated." (Tr. at 24.) The ALJ also cited Dr. Pushkash's opinion that work stress

19

caused plaintiff to drink. (Tr. at 24, 407.) The ALJ further noted Dr. Adamczak's conclusion that plaintiff may not have been honest about her drinking, as she smelled strongly of alcohol despite her claim of abstinence. (Tr. at 24, 463.) Given this evidence, it was not error for the ALJ to discount the low GAF scores assigned by the consultants. See Jones v. Astrue, No. 1:11-CV-00357, 2013 WL 228118, at *8 (N.D. Ind. Jan. 22, 2013) (finding that, while ALJ was not required to reference low GAF scores, he properly discounted score of 50 given other evidence of record). Nor did the ALJ abuse his discretion in not contacting the consultants for clarification. See Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004) ("An ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled. Here, the evidence was adequate for the ALJ to find Skarbek not disabled, and the ALJ acted within his discretion in deciding not to call a medical expert.") (internal citations omitted).

## B.    Dr. Harris's GAF Score

Plaintiff notes that she was treated by two psychiatrists during the relevant period. She saw Dr. Cueto from 2008 to 2010 (Tr. at 472-85), but neither the state agency nor the consultative examiners had Dr. Cueto's treatment records. Plaintiff's counsel was able to obtain them later, and they were made part of the record before the ALJ. Plaintiff agrees that the ALJ correctly characterized these records as "essentially illegible aside from prescribed medications." (Tr. at 22.) It does not appear Dr. Cueto ever offered an opinion on plaintiff's functioning, and plaintiff alleges no error in the ALJ's handling of Dr. Cueto's records.[10]

---

[10]In her reply brief, plaintiff suggests that the ALJ erred in giving great weight to the consultants' opinions, despite the fact that they did not see Dr. Cueto's notes or the treatment records created after their evaluations, without further developing the case record. The court will generally respect the ALJ's discretion in developing the record, requiring a significant

20

Plaintiff saw Dr. Harris from 2010-2011, and she argues that the ALJ never mentioned Dr. Harris's involvement in her treatment and, specifically, Dr. Harris's GAF score of 50. Plaintiff's broad claim is incorrect, as the ALJ specifically noted that plaintiff "has been seeing Dr. Harris since July 2010." (Tr. at 21.) The ALJ also mentioned the mental health wellness group therapy that Dr. Harris monitored. (Tr. at 21, 489.) It is true that the ALJ never mentioned the GAF score of 50 assigned by Dr. Harris during his initial evaluation on July 2, 2010. (Tr. at 500.) As noted above, however, an ALJ is not required to find disability based solely on a GAF score. Denton, 596 F.3d at 425. Nor does an ALJ's failure to specifically discuss a GAF score set forth in treatment records invariably require a remand. As also discussed above, a GAF score does not necessarily reflect the clinician's opinion of functional capacity, and plaintiff points to nothing in Dr. Harris's treatment notes suggesting specific functional limitations. See Jones v. Astrue, No. 11 C 4827, 2012 WL 2018534, at *9 (N.D. Ill. June 5, 2012) (rejecting claimant's argument that the ALJ discounted an opinion from his treating physician without explanation, where the claimant pointed only to GAF scores of 50-55 in the treatment notes, which did not otherwise contain an assessment of the claimant's ability to perform work-related mental activities). I therefore find no reversible error on this issue.

---

omission before remanding. Luna v. Shalala, 22 F.3d 687, 692 (7th Cir. 1994). Here, the ALJ had access to all of the treatment records in making his decision, and plaintiff points to nothing in Dr. Cueto's notes or the subsequent records that might reasonably alter the consultants' view of the case; Dr. Pushkash knew that plaintiff treated with Dr. Cueto for two years (Tr. at 404), and plaintiff concedes that Dr. Cueto's notes are essentially illegible. Thus, while the value of a consultant's opinion might be diminished if he lacked access to significant additional evidence, see Campbell, 627 F.3d at 308-09, there is no such evidence in the present case. Accordingly, the ALJ did not err in this regard. See Buckhanon ex rel. J.H. v. Astrue, 368 Fed. Appx. 674, 679 (7th Cir. 2010).

21

## C.    Concentration, Persistence, and Pace

Finally, plaintiff argues that the ALJ erred in attempting to account for her "moderate" limitations in concentration, persistence, and pace by limiting her to simple, routine, and repetitive work.  As the Seventh Circuit has explained,

> In most cases, . . . employing terms like "simple, repetitive tasks" on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace.  The ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity.

O'Connor-Spinner v. Astrue, 627 F.3d 614, 620 (7th Cir. 2010) (internal citations omitted).

However, in the present case the ALJ did more than limit plaintiff to simple, routine, repetitive work.  The RFC also included a restriction to low stress work (meaning only occasional work-related decisions, only occasional changes in job setting, and no fast-paced production requirements); avoiding moderate exposure to loud noise; and no interaction with the public and only occasional interaction with co-workers.  (Tr. at 20-21.)  The ALJ incorporated these limitations in his hypothetical question to the VE.  (Tr. at 73-74.)  Courts in this circuit have distinguished O'Connor-Spinner where the ALJ accounted for limitations in concentration, persistence, and pace by imposing similar restrictions.[11]  See, e.g., Cain-Wesa v. Astrue, No. 11-C-1063, 2012 WL 2160443, at *19 (E.D. Wis. June 13, 2012) (affirming where the ALJ restricted the claimant from fast-paced production requirements, with only simple work-related decisions, and allowing her to be off task 5% of the day due to impaired attention and concentration); Day v. Astrue, No. 4:11-cv-114, 2012 WL 1340777, at *15 (S.D.

---

[11]As the O'Connor-Spinner court noted, there is no "per se requirement that this specific terminology ('concentration, persistence and pace') be used in the hypothetical in all cases." 627 F.3d at 619.  It is permissible for an ALJ to use "alternative phrasing specifically exclud[ing] those tasks that someone with the claimant's limitations would be unable to perform."  Id.

22

Ind. Apr. 18, 2012) (affirming where the ALJ limited the claimant to simple, unskilled work, with no fast-paced production requirements, and one break approximately every two hours); Evans v. Astrue, No. 3:10-CV-0432, 2012 WL 951489, at *23 (N.D. Ind. Mar. 20, 2012) ("Relative to Evans' limitations in memory, concentration, persistence, and pace, the ALJ explained that an unskilled work designation further limited by simple routine tasks, and further restricted by a required flexible work pace with no fast paced or production requirements, would account for her moderate difficulties with sustaining concentration, persistence, or pace."); Murphy v. Astrue, No. 11 C 831, 2011 WL 4036136, at *12 (N.D. Ill. Sept. 12, 2011) (affirming where the ALJ limited the claimant to jobs with no strict quotas, are not fast paced, are not regarded as very stressful, and require only occasional interaction with people); see also Shepard v. Astrue, No. 1:12-CV-1307, 2012 WL 6731895, *8-9 (N.D. Ohio Dec. 28, 2012) (finding no error where the ALJ limited the claimant to a relatively static environment without fast-paced or frequent changes in routine); Evitts v. Commissioner of Social Sec., No. 11-cv-14609, 2012 WL 4470680, at *11 n.7 (E.D. Mich. June 29, 2012) ("The Court is not aware of any case remanding to alter the hypothetical when the ALJ included a quota- or pace-limitation to account for moderate deficiencies in concentration, persistence, or pace."), adopted, 2012 WL 4470649 (E.D. Mich. Sept. 26, 2012); Carrigan v. Astrue, No. 2:10-cv-303, 2011 WL 4372651, at *7 (D. Vt. Aug. 26, 2011) (finding that a limitation to routine and repetitive tasks with few, if any, work place changes, and no fast-paced jobs requiring the claimant to meet production quotas, accounted for moderate difficulties in concentration, persistence, and pace), adopted, 2011 WL 4372494 (D. Vt. Sept. 19, 2011); Morrison v. Astrue, No. 09-141, 2009 WL 5218058, at *6 (D. Me. Dec. 30, 2009) (finding that a restriction to simple, routine jobs not performed in a fast-paced production environment accounted for moderate difficulties in concentration,

23

persistence, or pace), aff'd, 2010 WL 583642 (D. Me. Feb. 16, 2010). Plaintiff accordingly fails to demonstrate that the ALJ's RFC and/or hypothetical question to the VE ran afoul of O'Connor-Spinner.[12]

## III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **AFFIRMED**, and this case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 1st day of February, 2013.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

---

[12]In her reply brief, plaintiff asserts that the ALJ also ignored her poor ability to handle stress and changes in routine. However, the ALJ specifically restricted plaintiff to low stress work involving only occasional work-related decisions and only occasional changes in job setting.

24